## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVID A. SCHOLL, BRIAN K. GLOVER, AND DENNIS W. VAUGHN, on behalf of the Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan, themselves, and a class consisting of similarly situated participants of the Plans, | Case no.:   CIV-17-279-R **JURY TRIAL DEMANDED** **COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| Plaintiffs, v. CHESAPEAKE ENERGY CORPORATION, THE BENEFITS COMMITTEE OF CHESAPEAKE ENERGY CORPORATION, THE INVESTMENT COMMITTEE OF CHESAPEAKE ENERGY CORPORATION, JAY HAWKINS, and JOHN DOES 1-20, Defendants. | |

## NATURE OF THE ACTION

1.     Plaintiffs David A. Scholl, Brian K. Glover, and Dennis W. Vaughn ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Chesapeake Energy Corporation ("Chesapeake" or the "Company") Savings and Incentive Stock Bonus Plan (the "Plan"), bring this action against the below-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.[1]

2.      This case is about the failure of the Defendants, as fiduciaries of the Plan, to protect the interests of the Plan's participants and beneficiaries (the "Participants") in violation of the Defendants' legal obligations under ERISA.  Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the putative class members who are also Participants by, *inter alia*, retaining Chesapeake Energy Corporation common stock (hereafter, "Chesapeake Stock" or "Company Stock") as an investment option in the Plan when a reasonable fiduciary using the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

3.      As pled in greater detail below, the Defendants permitted the Plan to continue to offer Chesapeake Stock as an investment option to Participants even after they knew or should have known that: Chesapeake Stock was, for a substantial portion of the Class Period (between February 27, 2015, and September 28, 2016), artificially inflated; through their access to massive amounts of publicly-available information, Chesapeake was in extremely poor financial condition; and the Company faced equally poor long term prospects, making it an imprudent retirement investment for the Plan.

---

[1] All allegations contained herein are based upon personal information as to Plaintiffs and the investigation of Plaintiffs' counsel.  It is likely that, once discovery begins in earnest, the roles of additional persons or entities in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further illuminated.  In that event, Plaintiffs will seek to amend this Complaint to add new parties and/or new claims in accordance with the Federal Rules of Civil Procedure and this Court's rules.

Defendants were empowered, as fiduciaries, to remove Chesapeake Stock from the Plan's investment options, yet they failed to so, or to act in any way to protect the interests of the Plan or its Participants, in violation of their legal obligations under ERISA.

4. Recently, in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that ERISA fiduciaries cannot continue to offer an imprudent plan investment option. In *Fifth Third,* the Court considered a class action similar to this one in which plan participants challenged a plan fiduciaries' failure to remove company stock as a plan investment option. The Supreme Court held that ERISA fiduciaries must independently determine whether company stock remains a prudent investment option. In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence." The Supreme Court rejected that argument, holding that "no such presumption applies," and further held "that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." Accordingly, the Plan's "fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general."

5. The thrust of Plaintiffs' allegations is that Defendants allowed the investment of the Plan's assets in Chesapeake Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plan for at least two separate reasons.

6. First, Chesapeake Stock was artificially inflated during at least part of the Class Period. During the Class Period: (i) the Company improperly accounted for the

acquisition and classification of oil and gas properties; (ii) Chesapeake lacked effective internal financial controls; and (iii) as a result, its public statements were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about Chesapeake's financial and business prospects.  As a result, on September 29, 2016, Chesapeake disclosed receipt of a subpoena from the U.S. Department of Justice ("DOJ"), in which the DOJ sought information relating to Chesapeake's accounting methodology for the acquisition and classification of oil and gas properties.  News of the subpoena caused Chesapeake's share price to fall by over 9%.

7.     Second, Chesapeake Stock was imprudent during the Class Period in light of Chesapeake's perilous financial condition which, as explained in detail below, included, among other things, a sea-change in the basic risk profile and business prospects of Chesapeake caused by: (a) collapse of oil prices which drastically and for the foreseeable future compromised Chesapeake's financial health; (b) the Company's deteriorating Altman Z-score ("Z-score") – a financial formula commonly used by financial professionals to predict whether a company is likely to go bankrupt – which indicated that Chesapeake was and is in danger of bankruptcy; (c) a crushing debt-load that in and of itself threatens the Company's survival; and (d) other indicia of financial distress, including downgrades of Chesapeake's credit ratings and a plunging stock price.

8.      The Z-Score,[2] referenced above, is a bankruptcy prediction model commonly accepted and used by financial analysts.  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding a Federal agency's use of Altman Z-Score analysis for predicting likelihood of bankruptcy and accepting that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

9.      A Z-Score greater than 2.99 is the "safe zone" meaning a company is unlikely to go bankrupt, a score of 1.88 to 2.99 is the "grey zone," and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.  During the Class Period, the Company's Z-Score was objective evidence its precarious financial condition.  Chesapeake's year-end Z-Score was:  0.99 in 2013; 1.15 in 2014; and -3.72 in 2015.  On January 16, 2017, gurufocus.com estimated the Company's Z-score was -2.87.

10.     Accordingly, the totality of circumstances prevailing during the Class Period rendered Chesapeake Stock an imprudent Plan investment, given the particular character and aims of the Plan discussed below.

11.     Plaintiffs further allege in the alternative, pursuant to FED. R. CIV. P. 8(d)(2), that (a) allegations of Chesapeake's serious deteriorating condition, evidenced by an exceptional amount of negative publicly available information, which was ignored by the Plan's fiduciaries in continuing to offer Company Stock, (b) Chesapeake's

---

[2] The Z-Score was developed in 1968 by Professor Edward Altman of the School of Commerce, Accounts and Finance, *nee* Leonard N. Stern School of Business, at New York University.

overwhelming debt, and (c) Defendants' failure to properly investigate the continued prudence of Chesapeake Stock and/or employ a reasoned decision-making process in evaluating Company Stock, each, individually, represents *Fifth Third*'s "special circumstances" which rendered reliance on the Company's stock price imprudent and supports a finding of breach of fiduciary duties as alleged herein in Counts I and II.[3]

12.     Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as Defendants here to retain and/or continue purchasing the clearly imprudent Chesapeake Stock as a Plan investment.  To remedy the breaches of fiduciary duties as described herein, Plaintiffs seek to recover the financial losses suffered by the Plan as a result of the diminution in value of Company Stock invested in it from June 1, 2014 to the present (the "Class Period").

13.     In an ERISA case such as this, the proper measure of damages is the difference between what the Participants received and what the Participants would have received if the Plan's assets had been invested prudently.  In other words, with respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants in the plan would not have made or maintained investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged

---

[3]   This type of special circumstance was specifically recognized by the author of *Fifth Third*, Justice Breyer, during oral argument of *Fifth Third*.  *See Fifth Third* Oral Argument Transcript at 31:10-18 (describing hypothetical situation where in a fiduciary's "inbox is ten feet of papers telling him about… the corporation's condition.  It's apparent he's never read them.  If he had read them, he would have taken action.  Of course you would have a case, I would think.").

investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the value of the Plan's assets to what they would have been if the Plan had been properly administered.

14.     Before the start of the Class Period, as of December 31, 2013, the Plan held $387,768,319 of Chesapeake common stock, which was approximately 46% of total investments.  Considering the closing price of $27.14 of Chesapeake Stock on December 31, 2013, the Plan held approximately 14,287,705 shares of Chesapeake Stock at that time. At year-end 2014, the Plan held $217,131,698 worth of Chesapeake Stock, and at year-end 2015, the Plan held $49,988,575 worth of Chesapeake Stock.  Given Chesapeake Stock's respective closing prices of $19.57 in 2014 and $4.50 in 2015, the Plan's holdings apparently went from 11,095,130 shares to 11,108,572 shares. The market price of Chesapeake Stock fell to as low as $1.50 per share, before somewhat recovering to each approximately $7.50 per share.

15.     Had the Plan's fiduciaries invested the Plan's holdings of Chesapeake Stock in the Plan in a prudent investment option, the Plan and its Participants would have realized a gain of tens of millions of dollars.  Even investing in a money market fund would have resulted in no loss of money to the Plan, and indeed a modest amount of interest, representing tens of millions of dollars of "savings" to the Participants.

## JURISDICTION AND VENUE

16.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).Cla

17.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

18.     ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more Defendants reside or may be found in this District.

## PARTIES

**Plaintiffs**

19.     Plaintiff David A. Scholl is a former Chesapeake employee and "Participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Plaintiff Scholl suffered losses in his individual Plan account as a result of investing in Chesapeake Stock during the Class Period.

20.     Plaintiff Brian K. Glover is a former Chesapeake employee and "Participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Plaintiff Glover suffered losses in his individual Plan account as a result of investing in Chesapeake Stock during the Class Period.

21.     Plaintiff Dennis W. Vaughn is a former Chesapeake employee and "Participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Plaintiff Vaughn suffered losses in his individual Plan account as a result of investing in Chesapeake Stock during the Class Period.

**Defendants**

      **(a)**    **The Company**

22.      Defendant Chesapeake is a producer of natural gas, oil and natural gas liquids (NGL) in the United States. The Company operates in two segments: Exploration and Production, and Marketing, Gathering and Compression. The Company is incorporated in Oklahoma and maintains its principal place of business at 6100 N Western Ave, Oklahoma City, OK 73118.

23.      According to the Plan's governing document (the "Plan Document"),[4] Chesapeake, as the Primary Employer, was both the Plan's Named Fiduciary and Plan Administrator.

      **(a)**    **The Individual Defendants**

24.      The Form 11-K filed with the Securities and Exchange Commission ("SEC") on behalf of the Plan on June 28, 2016 (the "2016 11-K") states that

> The plan administrator is a committee of Chesapeake employees who are appointed by and serve at the direction of Chesapeake (the "Benefits Committee"). The Benefits Committee is responsible for administration of the Plan, except for duties related to selecting and monitoring the investment options provided under the Plan. The selection and monitoring of investment options, and related functions, is the responsibility of a separate committee of Chesapeake Employees who are appointed by and serve at the direction of Chesapeake (the "Investment Committee"[ or the "Committee"]).

---

[4]     *See*     www.sec.gov/Archives/edgar/data/895126/000089512613000339/ chk11012013_ex101.htm.

25.     Both the Benefits Committee and the Investment Committee are named as Defendants herein.

26.     Upon information and belief, Defendant Jay Hawkins, Chesapeake's Vice President Human Resources, who signed the 2016 11-K as Plan Administrator, was one such person who was designated to act and did act on behalf of the Company.

### (a)     John Doe Defendants

27.     John Does 1-20 mean and include other Chesapeake officers, directors, and employees who were fiduciaries of the Plan during the Relevant Period, including members of the Benefits Committee, the Investment Committee, and any other committee(s) that acted on Chesapeake's behalf and any such committee(s) themselves, unknown to Plaintiffs at the time of their initial filing.  Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown John Does 1-20 include other individuals, including, but not limited to, Company officers, directors, and employees, and committee(s) who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Relevant Period.

### THE PLAN

28.     As summarized in the 2016 11-K:

### 1.     Description of the Plan

The following is a brief summary of the various provisions of the Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan (the "Plan").

### General and Eligibility

The Plan is a defined contribution plan that covers all eligible employees of Chesapeake Energy Corporation (Chesapeake) and its subsidiaries (collectively with Chesapeake, the "Company"), except for hourly employees of Chesapeake Appalachia, L.L.C., a wholly owned subsidiary of Chesapeake, who are members of the United Steel Workers of America Union. An employee becomes an active participant on the earliest date on which that individual becomes an eligible employee. An eligible employee is at least 18 years of age on his or her first day of employment. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA).

The plan administrator is a committee of Chesapeake employees who are appointed by and serve at the direction of Chesapeake (the "Benefits Committee"). The Benefits Committee is responsible for administration of the Plan, except for duties related to selecting and monitoring the investment options provided under the Plan. The selection and monitoring of investment options, and related functions, is the responsibility of a separate committee of Chesapeake Employees who are appointed by and serve at the direction of Chesapeake (the "Investment Committee").

Principal Trust Company, an affiliate of Principal Financial Group (Principal), served as the trustee and record keeper for the plan through September 30, 2015. Effective October 1, 2015, Fidelity Management Trust Company (Fidelity), serves as trustee and record keeper for the Plan.

Effective March 31, 2014, April 12, 2014 and August 8, 2014, the Plan was amended to change the vesting percentage to 100% for those employees who became employed by companies that purchased assets sold by the Company. Effective January 1, 2015, the Plan was amended to enable participants to decide on investment direction of all contributions in the Plan. Prior to January 1, 2015, Chesapeake directed the investment of matching contributions and Employee Stock Ownership Plan (ESOP) discretionary contributions. In addition, effective January 1, 2015, the Plan was amended to enable participants to immediately diversify out of matching contributions and

ESOP discretionary contributions invested in employer securities. Prior to January 1, 2015, a participant had to wait until they were age 55 or had completed three years of vesting service.

**Transfers**

Due to the Company's acquisition or divestiture activity as well as employee status changes, assets may transfer in to or out of the Plan. These transfers are shown as net transfers on the Statement of Changes in Net Assets Available for Benefits. There was $110,285 of net transfers out for employee status changes during the year ended December 31, 2015.

**Contributions**

Each year, participants may contribute up to 75% of pre-tax annual salary compensation and up to 100% of performance-related bonus compensation, as defined by the Plan, subject to certain limitations ($18,000 in 2015). Participants who are age 50 and above may elect to make additional "catch-up" contributions, limited to $6,000 in 2015. Participants may also contribute amounts representing rollover distributions from other qualified plans.

The Company matches 100% of participant contributions up to 15% of participant eligible compensation. The Company's matching contributions totaled $51,001,067 in 2015. Profit-sharing contributions may be made at the discretion of the Company. Contributions are subject to certain annual limitations under the Internal Revenue Code of 1986, as amended (the "Code"). No discretionary profit-sharing contributions were made in 2015.

The Company's matching contributions are made in cash. Participants can direct the contributions for investment in any of the investment options available to the Plan under or through the Plan documents, and may request the transfer of amounts resulting from those contributions between such investment options.

**Participant Accounts**

Each participant's account is credited with the participant's contribution and allocations of the Company's contribution and Plan investment income (loss). Allocations are based on participant investment income (loss) or account balances, as defined. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account balance.

**Vesting**

Participants are immediately vested in their personal contributions plus actual earnings thereon. Vesting of the Company's matching and profit-sharing contributions plus actual earnings thereon is based on years of credited service or retirement at or after age 65. A participant becomes 100% vested after five years of credited service under a graded vesting schedule.

29.     The Plan's December 1, 2015 Investment Policy Statement (the "IPS")

recognizes that the Committee

Plan Committee

The Committee has oversight responsibility of the Plan including:

• Developing an investment program that offers investment options.

• Asset classes and investment options with different risk/return characteristics so that Plan participants may prudently diversify their Plan funds.

• Selecting qualified investment managers and/or funds.

• Monitoring investment results to determine whether those responsible for investment results are meeting the guidelines and criteria identified in this Policy statement.

• If appropriate, taking action if investment performance is materially different from applicable performance measurement standards.

30.     The IPS also recognizes that "[t]he Committee reserves the right to add, delete or replace investment options based upon investment performance, market conditions, consultant input, participant response, or other factors affecting the overall investment program and the individual investment options offered."

31.     The IPS states, in part:

> With respect to the Plan's diversified options (i.e., all options except company stock), in consideration of Plan asset goals and objectives, several standards may be utilized in evaluation of investment performance (as opposed to a single measurement). These standards reflect several aspects of investment performance, including the specific objectives for the mandate, the market indices, and the performance of other fund managers. Each active portfolio will be compared to a universe of other active portfolios deemed to be most appropriate as well as to a benchmark index. Passive (i.e., index) funds will only be compared to their target index and not a universe. The appropriateness of the comparison will be determined by matching key characteristics of each portfolio against the characteristics of the portfolios in the universe.

## THE FUND

32.     At all relevant times, one of the investment options offered by the Plan was a Qualifying Employer Securities Fund (the "Fund" or "Chesapeake Stock Fund").

33.     The IPS states that an investment consultant was retained to advise the Company with respect to retaining, terminating, or placing all of the Plan's investment options, except for the Fund, on a watch list.  For the Plan's other options, the investment consultant "[p]erforme[ed] ongoing manager due diligence (generally and as specifically described below) and quarterly performance evaluation reporting."  However, "[w]ith respect to the Company Stock option, the due diligence and performance evaluation

reporting will be limited to a comparison of the company stock option's returns versus a benchmark selected by the Company; the Investment Consultant will not provide an opinion as to the prudence of the Plan's specific company stock though it may opine on company stock in general."

34.     The IPS states, with respect to the Fund, that

> performance results will be compared to a market index that the Committee deems appropriate. This may be a broad equity market index and/or an index specific to the Company's industry. In reviewing performance the Committee will only consider publically available information. Unless special circumstances affect the reliability of the stock's market price, the Committee will rely on the market to establish the value of the stock. If based on its review the Committee is considering stopping new purchases of company stock, liquidating current holdings, or releasing inside information to the public, the Committee may consider whether such actions might do more harm than good by creating a public perception that insider fiduciaries view the stock as a bad investment, which in turn may cause a drop in the stock price.

35.     The Plan's January 13, 2015, Investment Option Summary notes that the Standard & Poor's 500 Index (the "S&P 500 Index") was the Fund's benchmark, and provides the following comparison of the Fund to its benchmark:

| Investment Option Name | YTD Ret. | 1-Year | 3-Year | 5-Year | 10-Year | Since Incept. | Incept. Date |
|---|---|---|---|---|---|---|---|
| Chesapeake Stock [9,T] | -22.40 | -22.40 | -0.74 | -2.86 | 3.70 | 14.13 | 2/1993 |
| **Benchmark:** Standard & Poor's 500 Index | 13.69 | 13.69 | 20.41 | 15.45 | 7.67 | | |

36.     The January 13, 2015, Investment Option Summary thus shows that the Fund underperformed its benchmark by 36.09% on a 1-year and year-to-date basis, 21.15% on a 3-year basis, 18.31% on a 5-year basis, and 3.97% on a 10-Year basis.

While information about the S&P 500 Index is not included in the Plan's January 13, 2015, Investment Option Summary, Google Finance shows that, ignoring dividend reinvestments, the S&P 500 Index increased by over 360% from February 5, 1993 through January 9, 2015, thus the S&P 500 Index outperformed the Fund by over 350% since the Fund's inception. ***There was no relevant period in which the Fund even approximated the performance of its benchmark.***

37.     For deciding whether to place other funds on a watch list or terminate their offering in the Plan, other funds the Plan's fiduciaries considered other funds' "[c]onsistency of performance as represented by rolling three or five year performance versus benchmarks and peer groups" and their "risk-adjusted returns as represented by the information ratio, relative to an appropriate benchmark[.]"

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiffs, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan at any time between June 1, 2014[5] [three years prior to filing] to the present (the "Class Period") and whose Plan accounts included investments in Chesapeake Stock.

---

[5] Plaintiffs reserve their right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Chesapeake Stock constituted an imprudent investment option for the Plan.

39.    Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature present a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

40.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of employees of Chesapeake who participated in, or were beneficiaries of, the Plan during the Class Period whose Plan accounts included Chesapeake Stock.

41.    For example, the Plan's Form 5500 filed with the Department of Treasury, Internal Revenue Service, and the Department of Labor ("DOL") on September 19, 2016, shows that there were 7,812 Participants at the start of 2015 and 6,919 Participants at the end of 2015.

42.    At least one common question of law or fact exists as to Plaintiffs and all members of the Class that is capable of class-wide resolution.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

(a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs, and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiffs, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

17

(d)     whether the Plan, Plaintiffs, and members of the Class sustained damages and, if so, what is the proper measure of damages.

43.     Plaintiffs' claims are typical of the claims of the members of the Class because the Plan, Plaintiffs, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

44.     Plaintiffs will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiffs have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

45.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

46.     Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

18

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

47.     There were several red flags leading up to the start of the Class Period that alerted or should have alerted the Plan's fiduciaries that Company Stock had become an imprudent Plan investment option for two independent reasons: (1) Chesapeake Stock was artificially inflated; and (2) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.  From the start of the Class Period until the present, the Plan's fiduciaries have failed to cure their fiduciary breaches because, upon information and belief, Chesapeake Stock remains an investment option under the Plan and the fiduciaries have not frozen Chesapeake Stock Fund, or taken any other action, consistent with ERISA and the federal securities laws, to prevent the Plan and its Participants from investing any more money in imprudent Chesapeake Stock.

**Chesapeake Stock Was Artificially Inflated During the Class Period**

48.     Chesapeake markets itself as "the second-largest producer of natural gas and the 14th largest producer of oil and natural gas liquids (NGL) in the United States" with "interests in approximately 43,700 oil and natural gas wells and produced an average of approximately 661 mboe per day in the 2015 fourth quarter, net to our interest."  *See* Chesapeake Annual Report (Form 10-K) for Year End 2015 (filed February 25, 2016).  The Company's estimated proved reserves as of December 31, 2015, were 1.504 billion barrels of oil equivalent ("bboe").  *Id.*

49.     Throughout the Class Period, Chesapeake and its management made materially false and misleading statements regarding the Company's business,

operational and compliance policies. Specifically, those persons made false and/or misleading statements and/or failed to disclose that: (i) Chesapeake improperly accounted for the acquisition and classification of oil and gas properties; (ii) Chesapeake lacked effective internal financial controls; and (iii) as a result of the foregoing, Chesapeake's public statements were materially false and misleading between February 27, 2015, and September 28, 2016.

50.     On February 27, 2015, Chesapeake filed an Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K").   In addition to reporting the Company's financial results for 2014, the 2014 10-K stated, among other things:

> Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $230 million, $317 million and $434 million of internal costs in the 2014, 2013 and 2012, respectively, directly related to our oil and natural gas property acquisition and drilling and completion efforts. The decrease was primarily due to a decrease in our drilling activity, lower costs and increased emphasis on operational efficiencies.

51.     The Company updated its financial results and made substantially the same representation in its on Form 10-Q filed with the SEC on May 6, 2015, disclosing:

> Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and

completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $48 million and $57 million of internal costs in the Current Quarter and the Prior Quarter, respectively, directly related to our oil and natural gas property acquisition and drilling and completion efforts. The decrease was primarily due to a decrease in our drilling activity, lower costs and increased emphasis on operational efficiencies.

52.     The Company updated its financial results and made substantially the same representation in its Form 10-Q filed with the SEC on August 5, 2015, disclosing:

Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $65 million and $55 million of internal costs in the Current Quarter and the Prior Quarter, respectively, directly related to our oil and natural gas property acquisition and drilling and completion efforts. The increase was primarily due to capitalized payroll related costs as well as an increase in overhead.

53.     The Company updated its financial results and made substantially the same representation in its Form 10-Q filed with the SEC on November 4, 2015, disclosing:

Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $43 million and $52 million of internal costs in the Current Quarter and the Prior Quarter, respectively, directly related to our leasehold acquisition and drilling and

completion efforts. The decrease was primarily due to a decrease in capitalized payroll-related costs.

54.     The Company updated its financial results and made substantially the same representation in its 10-K filed with the SEC on February 25, 2016, for the fiscal year ended December 31, 2014 (the "2015 10-K"), disclosing:

> Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $196 million, $230 million and $317 million of internal costs in 2015, 2014 and 2013, respectively, directly related to our leasehold acquisition and drilling and completion efforts.

55.     The Company updated its financial results and made substantially the same representation in its Form 10-Q filed with the SEC on May 5, 2016, disclosing:

> Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $37 million and $48 million of internal costs in the Current Quarter and the Prior Quarter, respectively, directly related to our leasehold acquisition and drilling and completion efforts.

56.     The Company updated its financial results and made substantially the same representation in its Form 10-Q filed with the SEC on August 4, 2016, disclosing:

> Chesapeake follows the full cost method of accounting under which all costs associated with oil and natural gas property

> acquisition, drilling and completion activities are capitalized. We capitalize internal costs that can be directly identified with the acquisition of leasehold, as well as drilling and completion activities, and do not include any costs related to production, general corporate overhead or similar activities. We capitalized $35 million and $65 million of internal costs in the Current Quarter and the Prior Quarter, respectively, directly related to our leasehold acquisition and drilling and completion efforts.

57.    On September 29, 2016, at approximately 7:35 a.m., before markets opened, Chesapeake issued a Form 8-K (the "September 29, 2016 8-K") attaching a press release regarding a private placement of debt, and updating markets on litigation and regulatory matters.   Near the end of the announcements, Chesapeake noted that it had "received a [Department of Justice ("DOJ")] subpoena seeking information on [its] accounting methodology for the acquisition and classification of oil and gas properties and related matters."

58.    In response to the subpoena, the Company's stock fell $0.63, or 9.33%, to close at $6.12 on September 29, 2016.   The artificial inflation was more than the Company Stock's price decrease, as the negative news was padded by news about additional liquidity to repay debt that was maturing soon.

59.    As a result of the artificial inflation caused by the Company's failure to follow the full cost method of accounting properly, which resulted in the overstatement of assets and the resultant large decline in the market value of the Chesapeake Stock, Defendants breached their fiduciary duties and the Plan suffered losses and damages.

### **What Defendants Should Have Done**

60.     According to the Plan document, Chesapeake was the Plan's Administrator and Named Fiduciary.  It and the other defendants were, or should have been, aware that Chesapeake was not properly accounting for its drilling costs.  Disclosure, at the least, would have prevented the Plan from acquiring (through uninformed investment decisions and continued investment of matching contributions) additional shares of artificially inflated Company Stock: the longer the concealment continued, the more of the Plan's good money went into a bad investment; and full disclosure would have cut short the period in which the Plan bought Company Stock at inflated prices.

61.     Rather than do nothing (as they did), Defendants were obliged to fulfill their ERISA fiduciary duties to the Plan.  As set forth more fully below, none of these steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the Company Stock Fund than to help it.

62.     Defendants could have (and should have) directed that all Company and Plan Participant contributions to the Company Stock Fund be held in cash rather than be used to purchase Chesapeake Stock.  A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of Chesapeake Stock.

63.     Defendants also should have closed the Company Stock itself to further contributions and directed that contributions be diverted from Company Stock into

prudent investment options based upon the Plan Participants' instructions or, if there were no such instructions, the Plan's default investment option.

64.     Neither of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws.  Nor would ceasing to purchase additional Company Stock likely send a negative signal to the market based upon disclosures of Plan purchases in Forms 11-K.  Based on the Form 11-Ks filed on behalf of the Plan, the Plan's purchases alone were not large enough to affect the trading price of Chesapeake Stock.  Given the relatively small amount of Chesapeake Stock that might not have been purchased by the Plan in comparison to the enormous volume of actively traded shares, it is extremely unlikely that this proposed decrease in the number of shares would have had, considered alone, an appreciable adverse impact on the price of Chesapeake Stock.

65.     Further, Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Chesapeake Stock Fund.

66.     Instead of taking any of these actions, Defendants continued to allow the Plan to purchase and hold artificially inflated Chesapeake Stock while Chesapeake's disclosures continued representing that Chesapeake follows the full cost method of accounting kept its stock artificially inflated.

**Chesapeake Stock Was an Imprudent Investment During the Class Period Due to the Company's Changed Circumstances**

67.     In addition to Chesapeake Stock being imprudent due to artificial inflation, it was also imprudent due to the Company's changed circumstances leading up to the start of the Class Period.  Objective financial criteria indicated that Chesapeake was at severe risk of bankruptcy and was an unduly risky vehicle for retirement investment.

68.     Chesapeake is generally viewed as a natural gas play.  *See* "Chesapeake Energy Really Wants to Be an Oil Stock -- Barron's Blog", *Dow Jones Institutional News*, Nov. 8, 2016.  Its stock generally goes up and down as oil and gas go up and down, but it also has the extra baggage of substantial debt, discussed below.  As oil and gas prices declined over the past few years, as shown by the following charts,[6] Chesapeake Stock generally followed, and as global oil and gas oversupplies and lackluster demand grew, Defendants had less reason to think prices would rise.





---

[6]     *See*     http://www.nasdaq.com/markets/natural-gas.aspx?timeframe=3y     and http://www.nasdaq.com/markets/crude-oil.aspx?timeframe=3y



69.     As *The Daily Oklahoman* reported on December 17, 2016:

> [Doug] Lawler took over as CEO [of Chesapeake] in 2013 after a shareholder revolt ousted founder and then-CEO Aubrey McClendon. Lawler immediately outlined a plan to improve the company's finances and focus on developing its oil and natural gas properties rather than continuing to expand into new areas.
>
> "The transformation we set out to accomplish in 2013 to focus on value-driving was very successful early on. We made some good progress," Lawler said. "***Then prices tanked and we went into a survival mode, fighting for the stability and the financial health of the organization.*** The commodity prices, the dip in oil and gas prices, highlighted and ***exposed the financial weakness of the company***."

(emphasis added).

70.     Plaintiffs' claim of undue risk is about, as described below, the imprudent risk of investing retirement savings in overly leveraged natural gas play that was in "survival mode."  As noted above in Paragraph 9, Chesapeake's Z-Score was well within the "distress zone" where there was a high probability that it would go bankrupt within two years.

71.     Chesapeake generally became more efficient, but that efficiency did not translate into profitability in light of lower commodities prices.

72.     As *SeekingAlpha.com* reported in a December 30, 2013, article entitled "Gas Prices Leave Chesapeake Energy With a Catch 22":

> Chesapeake Energy (NYSE:CHK) is burning cash, and the Oklahoma City-based company has been forced to cut deals to cover the approximately $25 billion gap between how much the oil and gas producer spent from 2010 to 2012 and how much cash flowed into its coffers. The problem, according to Wunderlich Securities energy analyst Jason Wangler is that management "expected the world to be different than it is today," as he told the Wall Street Journal.
>
> The vision Chesapeake Energy had for the future of natural gas is one shared by many of its peers. Natural gas was first a boon for domestic energy producers and then an albatross. Hydraulic fracking, a process that cracks rock deep underground to release oil and natural gas, made production possible in many previously untapped shale fields, sparking a land grab. However, during President Barack Obama's tenure in the White House, soaring production of natural gas from horizontal drilling and hydraulic fracking has pushed supplies to record highs for many years. The boom in domestic production of both oil and natural gas provided the United States with 84 percent of its energy requirements last year, the highest annual level since 1991.
>
> But the shale gas revolution also swiftly changed the economics of natural gas. It prompted the industry to launch more than 100 new projects in the past several years specifically aimed at taking advantage of low prices, with investments totaling billions of dollars and 50,000 new jobs created. Now, the United States produces more natural gas than it can use, and as a result, prices have plummeted. The industry is generally profitable when gas is sold between $4 and $6 per thousand cubic feet. It is true that the price of natural gas has edged up as the weather has cold this year, hitting $4.36 per thousand cubic feet on the New York Mercantile Exchange on Monday.

However, the price of natural gas on the low end of that spectrum, and the price is expected to fall in coming months because of limited demand for the fuel. . . .

73.     *SeekingAlpha.com* also recognized, in a December 18, 2016 article entitled "US Shale Gas Industry: Countdown To Disaster", quoted from gurufocus.com, that "Free Cash Flow is considered one of the most important parameters to measure a company's earnings power by value investors because it is not subject to estimates of Depreciation, Depletion and Amortization (DDA)" and "[o]ver the long term, Free Cash Flow should give pretty good picture on the real earnings power of the company."[7] Chesapeake's Free Cash Flow has been negative for at least ten years, over which time Chesapeake "spent a whopping $60 billion more than they made from operating cash."

74.     Chesapeake has also been forced to dilute shares to satisfy debt, and is very highly leveraged, as shown by this chart included in the December 18, 2016 *SeekingAlpha.com* article which shows, *inter alia*, that as of this filing Chesapeake's liabilities exceed its assets:



---

[7] gurufocus.com/term/total_freecashflow/CHK/Free-Cash-Flow/Chesapeake-Energy

75.     Throughout the Class Period, Chesapeake slashed production and expenses and sold properties to survive, consistently losing money and writing down assets by billions of dollars.

76.     On February 26, 2014, *Dow Jones Institutional News* reported in an article entitled "Chesapeake Energy Swings to Loss – Update" that Chesapeake "reported a surprise fourth-quarter loss on asset-sale effects and other one-time items that masked the oil and gas producer's production and revenue growth.  The unexpected $116 million, or 24 cent per share, loss for the quarter riled the market and sent shares lower Wednesday, because analysts polled by *Thomson Reuters* were expecting Chesapeake to report a per-share profit of 41 cents."  The article noted that "Chesapeake has sold off nearly $15 billion of oil and gas fields and pipelines over the last two years, generating cash to pay down its debts. Chief Executive Doug Lawler has promised more sales and has pledged to rein in spending."

77.     On March 10, 2015, *The Motley Fool* reported in an article entitled "What's Behind Chesapeake Energy's Massive Plunge?" that:

> Among energy stocks, **Chesapeake Energy** (NYSE: CHK) has gone through more than its share of turmoil over the past several years. Three years ago, Chesapeake's concentration in natural gas worked against the company, as natural gas prices plunged to their lowest levels in more than a decade and crushed profits. Ongoing issues with former CEO Aubrey McClendon led to his departure in 2013, creating still more controversy and uncertainty. Now, Chesapeake faces its biggest challenge yet, as the company must deal with both its legacy issues and the impact of the drop in crude oil prices. Investors worry the energy company might not be as successful in rebounding from its current crisis as it has been in the past. . . .

**Whipsawed twice in a row**

The biggest problem that Chesapeake has faced is that its efforts to adapt to rapidly changing conditions in the energy markets have proven ill-timed. For a long time, the company emphasized natural gas production, with the early boom in gas-rich shale plays leading to substantial production gains. Yet when natural gas prices sank, Chesapeake was overexposed to the market, and that hurt it more than it did some of its more balanced peers.

In response, Chesapeake set out to increase its exposure to oil- and liquids-producing assets. Several major asset sales raised much-needed cash to handle its balance-sheet obligations, and soaring oil prices performed much better than the natural gas market.

That strategy worked well until the second half of 2014, when crude oil prices began their trip lower. Suddenly, Chesapeake found itself on the wrong side of the energy trade again; even though natural gas still represents the bulk of the company's production, investors feared Chesapeake's most obvious path to a full recovery was suddenly blocked.

What really hurt Chesapeake most recently, though, is the larger drop in prices of natural gas liquids. During its most recent quarter, Chesapeake's average price for natural gas liquids fell nearly 60%, now bringing in just $13 per barrel. Despite higher production, that crushed overall revenue, and near-term earnings were only saved by the fact that Chesapeake had hedged much of its future production of oil and gas.

**Can Chesapeake Energy recover?**

Even with its extensive losses, one thing is clear about Chesapeake: It would have been in much worse shape if it weren't for its recent restructuring moves. In hindsight, many of Chesapeake's asset sales came at a near-term top in the market, allowing it to maximize its proceeds from those deals. Using the proceeds to pay down debt rather than spending the money on new oil-rich assets also proved fortunate, and the spinoff of its oil-field services business allowed Chesapeake

to push some of its debt under a different corporate umbrella, leaving it with a healthier balance sheet.

Moreover, despite its moves, Chesapeake still has a substantial exposure to natural gas. That should help it salvage its results from over the past winter, with cold weather in the eastern U.S. helping to keep natural gas prices reasonably healthy even as oil plunged.

Still, Chesapeake has a number of long-standing problems to resolve. Between disputes over royalty payments that Chesapeake owes to landowners, alleged collusion with other industry players, and lawsuits claiming McClendon absconded with trade secrets when he left to start a competing energy company, Chesapeake investors are taking on significant risk.

The big wild card for Chesapeake is the impact of its cost-cutting efforts. With oil prices down, Chesapeake doesn't expect to spend nearly as much on capital projects geared toward boosting production. What really could make a big difference, though, are efficiency gains in boosting well productivity and reducing drilling costs. By keeping costs low, Chesapeake has the best shot at retaining a competitive advantage and making a full recovery if energy prices eventually cooperate.

Chesapeake Energy can recover from its most recent plunge. Yet at a challenging time for the entire energy sector, management will need a combination of smart business acumen ***and good fortune*** in order to convince investors that the worst could soon be over for the natural gas giant.

(emphasis added).

78.     On March 19, 2015, *Benzinga.com* reported in an article entitled "Sterne

Agee Issues Stern Warning On Chesapeake Energy" that:

Sterne Agee is out with a harsh criticism of Chesapeake Energy Corporation (NYSE: CHK) Thursday morning, while downgrading the company to Underperform with a $9 price target on the $14 stock.

Sterne's analysts said that the company has "questionable capital allocation" and a free cash flow deficit that "concerns us." All of this seems to be a hangover from prior management, which the analysts blamed for "sub-optimal capital allocation." The analysts cut their estimates in the belief that the rest of Wall Street will follow them lower.

Chesapeake Energy shares have dropped by 28 percent year-to-date as of Wednesday's close; however, Sterne noted that shares continue to trade at a "premium."

The analysts, who acknowledged being "late on this call," said that Chesapeake shares are still overvalued.

79.     On March 23, 2015, Chesapeake slashed its 2015 capital budget by more than 10% and sharply lowered its production outlook in response to lower oil prices.

80.     On April 30, 2015, Standard & Poor's Ratings Services ("S&P") revised its outlook in Chesapeake from stable to negative, and maintained its BB+ corporate credit rating on the Company's debt and B+ rating on its preferred stock.  Those ratings indicated the investments were non-investment grade high-yield bonds, otherwise known as junk bonds.

81.     On May 6, 2015, Chesapeake reported a loss of $3.8 billion, or approximately $5.72 per share, for the first quarter of 2015.

82.     On July 13, 2015, *Dow Jones Institutional News* reported that "[m]ore than 25% of Chesapeake Energy's (CHK) outstanding shares are owned by short-sellers, according to Sterne Age[.]"  In other words, a substantial amount of Chesapeake's "investors" believed its stock was overvalued or that the known risks Chesapeake faced would materialize in the near future.

83.     On July 21, 2015, Chesapeake announced that it would eliminate the dividend on its common shares and redirect the funds to capital spending.  In response, Chesapeake Stock tumbled 9.54% to $9.29 in heavy trading, hitting a 52-week low of $9.24.

84.     Summarizing investment in Chesapeake Stock on August 4, 2015, *TheStreet.com* reported in an article entitled "Chesapeake Energy Earnings Preview: Too Much Risk for Little Reward" that:

> Given the doom-and-gloom outlook spurred by plummeting oil prices, which is down some 20% since June, it's not hard to find a cheap energy company that's trading at its 52-week low. But placing the wrong bet on a company like Chesapeake Energy (CHK), which is also hurting from weak natural gas prices, doesn't make sense.
>
> In this case, Chesapeake, which reports second-quarter earnings Wednesday before the opening bell, is getting hit from both sides of its business. And the oil producer, which still plans to increase its oil and gas production for the year, is struggling to adjust to the "new normal," or the idea that oil prices -- now around $45 per barrel -- won't see, say, $70 to $80 for a long time, if ever. The company, based in Oklahoma City, was teetering on the brink of failure in 2011.
>
> Although the company has cut its capital expenses in an effort to preserve cash, it won't nearly be enough to offset the huge hit Chesapeake's business has already taken. The full-year consensus earnings-per-share estimate now stands at a loss of 26 cents, reversing 2014's profit of $1.49 a share. And even if you're thinking about buying CHK stock for the long-term, assuming an oil recovery, Chesapeake is still projected to post a 24-cent loss for fiscal-year 2016.
>
> This lack of profitability explains the punishment CHK stock has taken in the first half of 2015, plummeting almost 60%, against a 12% decline for the Energy Select Sector SPDR Fund (XLE). Why have investors abandoned the stock? Aside

for the tepid projected revenue and earnings growth in the quarters and years ahead, Chesapeake's cash status, which includes a net debt position of roughly $9 billion, increases the company's risk.

Indeed, other energy companies carry high debt levels. Some even have a worse cash-to-debt ratio than Chesapeake. But even if the term "solvency" is far from applicable, Chesapeake's cash position doesn't grant it the options it needs to capitalize of money-making projects should they materialize. And this -- among other reasons -- is why short sellers are betting against the company's failure.

***Almost 40% of Chesapeake's outstanding shares were sold short as of the last reporting period by the Nasdaq***. And with CHK stock having fallen some 70% on the past twelve months, the shorts have been right, given that ***the short interest on the stock has climbed 35% since the end of April, from 138 million to 185 million shares.***

(emphasis added).

85.    According to a July 23, 2015, *Valuewalk.com* article, "Credit Suisse analyst Mark Lear issued a bullish recommendation on the slumping oil & gas exploration and production in a recent note to investors" but "downgraded his stock rating for Chesapeake Energy to Neutral from Outperform and reduced his price target from $20 to $13 per share." The article continues:

Lear explained that its bearish recommendation for Chesapeake Energy was based on his perception that the energy company has a limited upside to its net asset value (NAV). According to him, the existing situation of the company offers investors with little reason to become optimistic.

He noted that Chesapeake Energy aggressively reduced its rig count. Its planned reduction next year reflected a relatively weak output and cash flow. Lear believed that the company will be extremely tight with spending over the next quarter after its huge spending in the first quarter.

Furthermore, the analyst believed that Chesapeake Energy concentrate on protecting its balance sheet instead of increasing its production or expanding its holdings. In other words, the company will operate its business in a defensive manner.

"We think investors should look elsewhere for investment in this environment and consider operators with core exposure and more flexible balance sheets that are capable of accelerating NAV even at the strip," said Lear.

86.     On August 5, 2015, according to the *Fort Worth Star-Telegram*, Chesapeake reported a $4.1 billion loss including a $3.7 billion write-down of its assets. Its adjusted net loss, excluding charges, was $83 million, or 11 cents a share, compared with a $281 million profit in the same quarter the prior year.  The article further reported that Chesapeake CEO Lawler "said that the downturn in commodity prices presents a *severe test* for his company but that Chesapeake remains focused on lowering costs and improving operational efficiencies." (emphasis added).  The article further quotes CEO Lawler as stating "I came to Chesapeake two years ago because I considered it to be the biggest challenge and thus the biggest opportunity in the industry."

87.     In response to Chesapeake's dismal earnings, *Midnight Trader Live Briefs* reported in an article entitled "Update: Chesapeake Energy Shares Drop to 12-Yr Low Amid Plans For Strategic Asset Sales" that:

> Shares of Chesapeake Energy (CHK) fell to their lowest level since May 2003 on Wednesday as the producer of oil and natural gas said it is considering strategic options for assets in a bid to increase liquidity and future cash flow.
>
> "The downturn in commodity prices *has presented a severe test* to our industry," CEO Doug Lawler said in a statement. "I believe the strength and optionality of our portfolio

> provides meaningful opportunities to increase our liquidity and future cash flow. As a result, we are reviewing opportunities in multiple operating areas to create additional value through strategic asset sales, joint venture agreements and participation, or farmout agreements. Options for potential transaction proceeds include additional drilling in 2016 and enhancing our capital structure."

88. On August 12, 2015, *TheStreet.com* reported that Jefferies & Company noted that "Chesapeake Energy burned through $2.1 billion of cash in the first half year including $800 million to address working capital deficits[.]"

89. On September 29, 2015, Chesapeake announced it would cut its workforce by 15% to reduce costs. Dow Jones Institutional News reported in part that:

> "As you are fully aware, the current commodity price environment continues to be a challenge for our industry and for Chesapeake," Chief Executive Doug Lawler wrote in an email to employees. "While this was extremely difficult, we are acting decisively and prudently to enhance the long-term competitiveness and strength of Chesapeake."

90. On October 1, 2015, *The Daily Oklahoman* reported that Chesapeake had "amended its existing $4 billion line of credit, easing some of its borrowing restrictions. Under terms of the deal, Chesapeake's existing credit line has become a secured credit facility[.]" The article further reported that "Chesapeake did not disclose what it is using as collateral for the secured loan" and "[t]he credit facility can become unsecured again if the company meets certain[, undisclosed] conditions[.]"

91. On October 6, 2015, Moody's Investors Service ("Moody's") downgraded Chesapeake's Corporate Family Rating ("CFR") to Ba2 from Ba1 and its senior unsecured notes ratings to Ba3 from Ba1, with a rating outlook for all changed to

negative from stable.   A Ba1 rating indicates non-investment grade high-yield bonds, otherwise known as junk bonds.  Moody's stated, in part:

> "The downgrade reflects the toll that low natural gas and oil prices has taken on Chesapeake's cash flow generation and the ensuing weakness in forecasted cash flow based financial leverage metrics in 2016," said Pete Speer, Moody's Senior Vice President. "Despite the substantial progress the company has made in lowering its cost structure, Chesapeake will have to execute on assets sales and other transactions to meaningfully reduce its debt levels to better align its capital structure with the current commodity price environment."
>
> * * *
>
> The rating downgrade reflects Chesapeake's high debt levels relative to its cash flow generation capacity in a prolonged low oil and gas price environment and the structural subordination of its unsecured creditors by its newly secured revolving credit facility. Based on Moody's commodity price assumptions, Chesapeake's retained cash flow (RCF) to debt and interest coverage (EBITDA/Interest) will fall to around 5% and 2x in 2016, which are very weak metrics for a Ba-rated exploration and production company. The company's low cash flow generation will likely result in negative free cash flow in 2016 which combined with debt maturities will consume its remaining cash balance and result in some utilization of its revolver by the end of 2016. Moody's expects the company's capital spending in 2016 to be lower than 2015, resulting in declining production volumes and reserves in 2016 as capital spending will fall below maintenance levels.

92.     On October 28, 2015, Morningstar issued a "B+" credit rating to Chesapeake, suggesting the Company was a high default risk.

93.     On November 4, 2015, *Dow Jones Institutional News* reported in an article entitled "Chesapeake Energy Swings to Loss on Impairments -- Update" that:

Chesapeake Energy Corp. on Wednesday warned it could significantly cut its capital spending next year, as the U.S. shale driller swung to a third-quarter loss amid heavy write-downs.

* * *

Chesapeake reduced its average operated rig count to 18 in the third quarter from 26 in the second quarter and 69 in the prior-year period.

Chesapeake's daily production averaged around 667,000 barrels of oil equivalent a day, an increase of 3% over the same period in 2014 adjusted for asset sales. Chesapeake has also been selling properties to pay off its debt after years of heavy borrowing to snap up oil and gas prospects under its former chief executive.

The company's average realized oil price for the quarter fell 26% from the prior year to $62.68 a barrel.

Overall, for the quarter ended Sept. 30, Chesapeake reported a loss of $4.65 billion, or $7.08 a share, compared with a prior-year profit of $662 million or 26 cents a share.

Excluding the $4.51 billion impairment charge and other items, Chesapeake posted a per-share loss of 5 cents. Analysts had forecast a loss of 13 cents a share.

Revenue plunged 49% to $2.89 billion, missing the $3.02 billion analysts had forecast.

94.     On November 4, 2015, *Dow Jones Institutional News* reported in an article entitled "Chesapeake Energy Feels the Burn -- Barron's Blog" that:

Posting a smaller-than expected third-quarter loss wasn't enough to help Chesapeake Energy (CHK) shake off persistent worries about cash burn.

As Citigroup analyst Robert Morris writes:

CHK ended Q3 with a cash balance of $1.76bn vs. our $1.95bn forecast as the company incurred another drop in working capital ($158mm) as it further reduced

activity...Although production topped Consensus expectations and costs are being sharply reduced, we believe there remains a focus on "cash burn" and CHK's ability to execute accretive asset sales to reduce leverage, of which there was no mention in this morning's release. Thus, we believe CHK's shares should track in line with its large-cap E&P peers although short covering could spark a rally.

No rally today. Chesapeake gave up premarket gains, and went on to plunge 7% to a recent $7.06.

Chesapeake is among the large U.S. energy companies that have written down the value of their oil fields and slashed capital spending in the face of an rout in oil prices. The depressed market means it isn't worth drilling on many of its properties.

Revenue for the third quarter fell 49% to $2.89 billion, missing the $3.02 billion expected by the Street.

Earlier today, Chesapeake cut its 2015 capital spending budget for the second time this year, and warned that spending cuts could be in store for 2016.

Capital expenditures this year are now expected to range from $3.4 billion to $3.9 billion, compared to the previous $3.5 billion to $4 billion forecast.

95.     On November 14, 2015, *American Banking and Market News* reported that a Chesapeake debt issue with a 7.25% coupon that matured on December 15, 2018, was trading at $75.00, but had been trading at $81.75 the prior week.

96.     On November 11, 2015, Fitch Ratings ("Fitch") downgraded Chesapeake's Long-term Issuer Default Rating ("IDR") to BB- from BB, indicating the debt remained non-investment grade high-yield bonds, otherwise known as junk bonds, and slid further towards being "highly speculative."  Fitch noted that:

Chesapeake's ratings reflect its considerable size with an increasingly liquids-focused production profile and proved

> reserves (1p) base, solid reserve replacement history, adequate near-term liquidity position, and strong operational execution with ongoing improvements leading to competitive production and cost profiles. These considerations are offset by the company's levered capital structure, continued exposure to legacy drilling, purchase, and overriding royalty interest obligations, natural gas weighted profile that results in lower netbacks per barrel of oil equivalent (boe) relative to liquid peers, and weaker realized natural gas prices after differentials are incorporated.

97.      On December 5, 2015, *American Banking and Market News* reported that a Chesapeake debt issue with a 6.875% coupon that matured on November 15, 2020, was trading at $36.75, but had been trading at $48.50 the prior week.

98.      On December 15, 2015, *The Wall Street Journal* reported in an article entitled "Business News: Chesapeake Energy Works With Advisers To Reduce Debt Load" that:

> Chesapeake Energy Corp. is working with restructuring advisers at Evercore Partners Inc. to shore up its balance sheet as commodity prices extend their decline, according to people familiar with the matter.
>
> Evercore's bankers are advising the natural-gas producer on potential measures to reduce its $11.6 billion debt load, such as exchanging existing bonds at a discount for new securities or selling assets, the people said.
>
> The Oklahoma City-based company, co-founded in 1989 by famed wildcatter Aubrey McClendon, became one of the dominant U.S. gas explorers during the shale boom.
>
> Fueled by cheap debt, Chesapeake expanded aggressively in Ohio, Texas and other parts of the U.S., becoming the country's second-largest, natural-gas producer behind Exxon Mobil Corp.
>
> But the tumble in natural gas prices has hurt the company, which has posted three straight quarterly losses this year.

Chesapeake ended September with $1.8 billion in cash, down from $4.1 billion at the end of 2014, according to regulatory filings.

Chesapeake's share price has fallen nearly 80% this year to $4 per share. Its market capitalization currently stands at roughly $2.8 billion, down from $11.4 billion a year ago.

Natural gas prices fell to their lowest point in more than a decade Monday, as record-high December temperatures in New York and other cities sap demand for heating fuel.

Prices are down 35% this year and 69% below their February 2014 highs, driven largely by oversupply after advances in drilling techniques unlocked new reserves in shale-rock formations across the U.S.

Chesapeake's bonds have been among the hardest hit in a recent selloff of junk-rated energy-company debt, driven in part by continued declines in oil and gas prices. A broader decline in high-yield bond and loan prices has further weighed on energy companies' debt.

Chesapeake's $1.3 billion in bonds due in 2020 bearing 6.625% interest recently *traded at 28 cents on the dollar, down from 47 cents late last month, according to MarketAxess.*

Chesapeake already has taken steps to reduce its debt load. The company is offering to exchange bonds at a discount for up to $1.5 billion of new debt. Investors who take the offer would accept a reduction in the face value of their debt in exchange for a stronger claim on the company's assets.

The proposed swap follows a deal Chesapeake cut with its banks earlier this year that allowed it to issue the new high-ranking debt. In return, Chesapeake agreed to secure its $4 billion credit line with a top-ranking claim on its assets.

Dozens of money-losing oil-and-gas companies have issued new debt this year, sometimes swapping it for discounted bonds, in an effort to ride out the slump in prices. SandRidge Energy Inc., Midstates Petroleum Co. and Halcon Resources Corp. all have done such deals this year.

(emphasis added).

99.     On December 14, 2015, *American Banking and Market News* reported that 30.6% of the Company's shares were sold short as of November 30, 2015.

100.     On December 16, 2015, Fitch downgraded Chesapeake's Long-term IDR to B from BB-, indicating the debt investment was considered "highly speculative." Fitch noted, in part:

> The downgrade reflects the limited near-term liquidity relief provided by the exchange and the potential for low hydrocarbon prices (in particular the recent drop in natural gas prices to below $2.00/mcf) to negatively impact the company's plans to raise liquidity through asset sales. Fitch believes asset sales are likely to be natural gas focused given management's long-term strategy to increase its liquids-focused production mix. Ultimately, the company is expected to use its large, diversified asset base to manage their medium-term operational and financial obligations currently providing a margin of safety at the 'B' level. Fitch believes there is an adequate number of peer and financially-backed E&P companies that have a considerable amount of capital looking to be deployed for M&A.

> The Negative Outlook reflects heightened asset sale execution risk, as well as the potential for further deterioration of the company's free cash flow (FCF) profile. In our view, the private exchange offer signals management's difficulty selling assets in the current stressed hydrocarbon pricing environment to help address forecast FCF shortfalls and debt maturities.

> \* \* \*

> Chesapeake's ratings reflect its considerable size with an increasingly liquids-focused production profile and proved reserves (1p) base, solid reserve replacement history, adequate near-term liquidity position, and strong operational execution with ongoing improvements leading to competitive production and cost profiles. ***These considerations are offset by the company's levered capital structure, continued***

> ***exposure to legacy drilling, purchase, and overriding royalty
> interest obligations, natural gas weighted profile that results
> in lower netbacks per barrel of oil equivalent (boe) relative
> to liquid peers, and weaker realized natural gas prices after
> differentials are incorporated****. In the near term, the sharp
> drop in U.S. natural gas prices linked to a strong El Nino
> weather pattern have also weighed on the company.

(emphasis added).

  101. On December 22, 2015, S&P downgraded Chesapeake to B, with a

negative outlook, indicating debt investment was considered "highly speculative."  S&P

stated, in part:

> "We have reassessed Chesapeake's business risk and have
> revised our assessment lower to fair from satisfactory, said
> Standard & Poor's credit analyst Paul Harvey. "We expect
> profitability to continue to suffer due to low natural gas and
> crude oil prices, compounded by very high costs related to its
> gathering and processing contracts," he added.
>
>           * * *
>
> The negative outlook reflects our expectation that liquidity
> could significantly weaken during the next 12 months due to
> high negative free cash flows and potential negative
> borrowing base redeterminations. Chesapeake will face
> challenging industry conditions exacerbated by its high debt
> levels. Additionally, given uncertainty in natural gas and
> crude oil prices combined with weaker capital markets for the
> sector, we believe achieving large asset sales will be
> challenging. Finally, we expect financial measures to remain
> weak despite the expected reduction in debt following
> Chesapeake's recent exchange offer. FFO to debt will be
> below 8% and debt to EBITDA about 8x under our base-case
> assumptions.

  102. On December 24, 2015, *Dow Jones Institutional News* published an

article entitled "Chesapeake Energy: Will It or Won't It? -- Barron's Blog" which

reported, in relevant part:

These days, nearly all the debate surrounding Chesapeake Energy (CHK) is whether the beaten down energy company is going to have to default on its debt. Earlier this week, Citigroup's Marisa Moss argued that Chesapeake's debt load was unsustainable given low energy prices. Morningstar's Mark Hanson, however, argues that "default is far from imminent." In a note released on Dec. 22, he explains why:

> Plummeting oil and natural gas prices have amplified concerns about Chesapeake's financial health to the point many investors are saying it's not a matter of if, but when, the company will declare bankruptcy. While we recognize the considerable challenges posed by the current environment, we don't believe default is a foregone conclusion.

> If successfully executed, Chesapeake's remaining lifelines—debt exchanges and asset sales, both of which are in process—would provide a much-needed liquidity runway and help preserve value for shareholders. But time is of the essence, and the risk of a credit event has significantly increased as oil and gas prices have fallen.

> The two most important milestones for investors to keep an eye on over the next few quarters are 1) the final results of Chesapeake's debt exchange offer at the end of this month, and 2) the company's borrowing base re-determination in mid-April 2016. If each plays out favorably, the company should be fine from a covenant and liquidity standpoint through 2018 (albeit without much cushion should oil and gas futures prices fall from current levels).

103.    On January 22, 2016, Chesapeake suspended dividends on its preferred shares.  CEO Doug Lawler stated "Given the current commodity price environment for oil, natural gas and natural gas liquids, we believe that redirecting this cash toward debt retirement provides better returns for the company."  *TheStreet.com* reported, in part, in a January 25, 2016, article entitled "Here's Why Chesapeake Energy Isn't Coming Back,"

that "[n]ot paying dividends on preferred shares may <u>save the company millions</u> (on the surface a smart move), but the blemish on its reputation and standing in the market as a result of the same, is without a doubt, staggeringly huge."   *TheStreet.com* further reported:

> Obviously Chesapeake is keeping its cards pretty close to its chest. The company is buying time -- $4 billion dollars' worth of it, with the newly amended credit facility. The question is, is this enough to restore the balance?
>
> Bear in mind, a clutch of analysts suggest that a credit issue for the company could blow up before 2018.
>
> While some investors (with an appetite for risk) may believe that they could "catch a falling knife" and ride a possible turnaround, we on the other hand suggest quite the opposite. Chesapeake is one of this year's expected market downturn. Bottom fishing is a true art in any market environment, but the trouble with Chesapeake is, nobody can call the bottom on this quagmire of a company.
>
> The worst performer for the S&P 500 should take a significant amount of time to shed its leverage. And until then what can you expect? In all probability, continued earnings losses and further cash flow problems.
>
> Additionally, when investors are shunning junk energy bonds, there is little merit in picking up junk energy stocks (like Chesapeake), especially if you are not a trader.
>
> * * *
>
> Unless there is a marked improvement in the natural gas and oil price environment, Chesapeake is a cheerless proposition. How else would you fathom the alarming figures -- a company with a $2.33 billion market cap and $11.60 billion debt?

104. On January 25, 2016, S&P downgraded Chesapeake's corporate credit rating to CCC+ from B, noting there were "[s]substantial risks" to the investment, and it was more than "highly speculative." S&P wrote, in part:

> "The downgrade reflects the implementation of the recent change in our base case oil and natural gas price assumptions," said Standard & Poor's credit analyst Paul Harvey. We lowered our 2016, 2017, and long-term price assumptions for Henry Hub natural gas by over 15% and West Texas Intermediate (WTI) crude oil by about 20%, which resulted in significantly weaker financial measures for Chesapeake, with funds from operations (FFO)/debt under 5% and debt/EBITDA well over 10x for the next two years. At such levels, we assess debt leverage as unsustainable. Based on our price assumptions, we expect only limited improvement in the near-term and that Chesapeake will face both a challenging operating environment and weak capital markets as about $2 billion of debt comes due in 2017. The downgrade of the preferred stock to 'D' reflects the suspension of dividends on that security, which we view as a default.

> * * *

> The negative outlook reflects our expectation that financial measures will remain very weak over the next 24 months based on our natural gas and crude oil prices assumptions. Under these challenging conditions, we expect debt leverage to exceed 12x on average. Additionally, liquidity is likely to be challenged under these low prices, both from diminished cash flows and potential reductions in the company's borrowing base. Also, the negative outlook reflects the potential that Chesapeake could launch an exchange offer or other refinancing we would view as distressed, resulting in a selective default.

105. On February 7, 2016, *American Banking and Market News* reported that Chesapeake debt issue with an 8% coupon that matured on December 15, 2022, was trading at $38.00, but had been trading at $43.25 the prior week.

106.    On February 8, 2016, after a report that it had hired restructuring lawyers sent the Company's share price down so violently it triggered several market trading halts, Chesapeake released a statement that:

> Chesapeake Energy Corporation (NYSE:CHK) stated today that Kirkland & Ellis LLP has served as one of Chesapeake's counsel since 2010 and continues to advise the company as it seeks to further strengthen its balance sheet following its recent debt exchange. Chesapeake currently has no plans to pursue bankruptcy and is aggressively seeking to maximize value for all shareholders.

107.    On February 8, 2016, *The Wall Street Journal* reported in an article entitled "Chesapeake Energy: The End Isn't So Near; Chesapeake Energy is in survival mode, but investors have reacted with undue alarm to steps it has taken to stay afloat" that:

> Each of these cash-preserving moves was predictable, though. It is no doubt soliciting advice on future steps even if they don't yet include bankruptcy. A near-term one might be tapping its revolving-loan facility before it is redetermined this spring and perhaps selling more noncore assets. It can try redeeming more heavily discounted unsecured debt or use cash to maintain output. Chesapeake can almost certainly repay a note that matures in March and probably hang on until early 2017 without help from natural-gas prices.
>
> The sooner they recover the better, of course. With its price hedges no longer offering much protection, Chesapeake's survival as a going concern is in serious doubt if prices remain below $3 per million British thermal units. They now fetch about $2.10, close to their lowest in more than a decade for this time of year.

108.    On February 10, 2016, *EI Finance* reported in an article entitled "Is Chesapeake Energy Doomed or Too Big to Fail?" that:

In its latest investor presentation, Chesapeake Energy makes a bold pledge: "Our diverse portfolio of highly efficient investments is built to withstand the current commodity price environment."

But what if it isn't? What if -- as a growing number of analysts fear -- the second-largest US natural gas producer has so much debt and so little capacity to dig out of it that bankruptcy is the only option? Despite Chesapeake's own assertions to the contrary as recently as Monday, this is not a far-fetched scenario for a company whose stock price has plunged 90% in the past year alone -- cutting its market capitalization to less than $1 billion, or one-twelfth of its standing debt -- and whose balance sheet has turned a deepening shade of red. Standard & Poor's on Tuesday downgraded Chesapeake's junk-rated credit for the second time in two weeks, to "CCC" from "CCC+," citing the growing likelihood of a "selective default."

The prolonged gas and oil price slump is already taking more and bigger prisoners in North America. At first it was just tiny independents that filed for Chapter 11 protection, but in recent months mid-cap explorers such as Magnum Hunter Resources and Swift Energy have joined the unenviable group ( EIF Jan.6'16 ). The combined debt of the 40-plus US E&P companies in bankruptcy is around $14 billion -- not a whole lot more than the $11.6 billion Chesapeake owed as of Sep. 30. And Monday, Chesapeake acknowledged it has retained legal adviser Kirkland & Ellis, a firm known to help producers restructure through bankruptcy court, even though Chesapeake insists that Chapter 11 is not currently on the table.

109.    On February 12, 2016, Dow *Jones Industrial News* published an article entitled "Chesapeake Energy: How Low Can It Go? -- Barron's Blog" which reported:

"How Low Can Chesapeake Go?" Waiting For Asset Sales, Midstream Commitment and Debt Restructurings: Chesapeake Energy shares are down 45% this week following an article stating the company had retained Kirkland & Ellis to help restructure a $9.8bn debt load. At YE'15, Chesapeake had $1bn of cash and $4.0bn available on its revolver but

confronts a $550mm legal ruling this year, $3.4bn of debt maturing over the next three years and the possibility of a lower borrowing base with the Spring RBL redetermination. Indeed, absent a combination of substantial asset sales, midstream commitment restructurings, a significant rebound in both oil and natural prices, some form of capital infusion, and/or if its borrowing base falls below $3bn, we believe these obligations present an unsurmountable obstacle, potentially posing a Chapter 11 filing by YE'17 or in 2018. However, we believe that a Chapter 11 event in 2016 is unlikely given ample liquidity at this juncture.

110.    On February 16, 2016, Morningstar gave Chesapeake a CCC+ credit rating, indicating a very-high default risk.

111.    On February 22, 2016, Moody's lowered its rating on Chesapeake's debt further into "junk" territory, to Caa2 from B2, noting substantial risks, as the continued collapse of oil prices continued to drain cash flows need for debt obligations and cited Chesapeake's high debt level and weak liquidity as contributing to its "unsustainable capital structure."

112.    On February 24, 2016, Chesapeake announced that it had lost $2.2 billion in the fourth quarter of 2015. Doug Leggate, an analyst for Bank of America Merrill Lynch, said there are still concerns about the company's financial position and noted "[w]e still believe it is burdened by too much leverage and by legacy transportation agreements, and that *if the strip (prices) were to hold true, that the stock has no equity value.*" (emphasis added).

113.    Among other things, on February 24, 2016, Chesapeake said it planned to cut capital expenditures by at least half in 2016 and projected an annual decline in production of up to 5%, excluding asset sales.  For 2015, Chesapeake reported a full-year

loss of $14.86 billion, which included $14.53 billion in charges, much of which was from the Company reducing the value of its oil and natural gas properties.

114.    On February 24, 2016, *The Business Insider* reported in an article entitled "It's going from bad to worse at Chesapeake Energy (CHK)" that:

> It's going from bad to worse at Chesapeake Energy.
>
> The shale drilling giant announced plans Wednesday to cut its capital expenditure significantly this year compared to 2015.
>
> Its fourth-quarter earnings release said its capital spending would total $1.3 billion to $1.8 billion this year, 57% lower than what it spent in 2015.
>
> The company is aiming to divest from up to $1 billion of its assets to raise cash. And since the end of last year, it's sold or agreed to sell $700 million in assets, more than it had previously forecast.
>
> The reason is simple (emphasis ours):
>
> "In light of the **challenging commodity price environment**, our focus for 2016 is to improve our liquidity, further reduce our cost structure and address our near-term debt maturities to strengthen our balance sheet," CEO Doug Lawler said in the statement.
>
> He continued, "Our tactical focus areas remain asset divestitures, of which we are pleased to have approximately $500 million in net proceeds closed or under signed sales agreements, liability management and open market purchases of our bonds."
>
> As oil and gas prices collapsed, the company laid off staff and shut down operations to lower costs.
>
> Earlier this month, Chesapeake shares plunged more than 50% following a Debtwire report that it had hired Kirkland & Ellis to restructure $9.8 billion in debt.

Shares fell as much as 4% in pre-market trading to $2.10. The stock is down 89% over the past 12 months, and was the worst performer on the S&P 500 last year.

For the full year 2015, Chesapeake recorded a net loss of $15 billion, or $22.43 per diluted share. Its fourth-quarter loss came in at $2.2 billion, or $3.36 per diluted share. It made a profit in the same quarter the prior year.

115.     On April 12, 2016, *RealMoney* reported in an article entitled "Stressed Out: Chesapeake Energy's Credit Deal Buys Time . . . but Little Else" which was "part of a Real Money series on 20 companies investors should consider adding to their distressed watch list" that:

Chesapeake Energy (CHK) may have been granted breathing room in its new borrowing base redetermination but it is too early for the company -- and shareholders and creditors -- to breathe a sigh of relief.

On Monday, the Oklahoma-based oil and gas company announced that it entered into a third amendment on its senior secured revolving credit agreement with MUFG Union Bank. The market rejoiced as shares of Chesapeake Energy closed up 19% on Monday and continued rallying as much as 30% Tuesday morning to about $5.60.

The company, which is a member of Real Money's "Stressed Out" list, was able to maintain its borrowing base at $4 billion and was granted an extension on its future redetermination to June 2017 from October 2016.

As analysts were expecting Chesapeake Energy's borrowing base to be reduced, the borrowing base redetermination has largely been viewed as positive news. However, to get such favorable terms, the company had to pledge "substantially all" of its assets, according to the company's filing with the Securities and Exchange Commission on Monday.

The new amendment provides short-term relief for the company, which may allow it to weather the era of lower-for-longer energy prices, but the company still has a debt load

nearing $10 billion that it must contend with. Almost 30% of that debt comes due in the next two years.

Put simply: Chesapeake Energy pledged nearly everything to get $4 billion in credit while it has nearly $10 billion debt outstanding. Because much of Chesapeake Energy's outstanding debt is unsecured, the chance that bondholders can recoup anything in the event of a restructuring is much riskier.

"The amendments cited in the press release do seem to provide the Company a good deal of liquidity for 2016, but we note that 2017 is when the much greater funding requirements potentially come into play," David Epstein of CRT Research wrote in a note on Monday.

Chesapeake has $1.9 billion in notes coming due in 2017, according to its 10-K filing with the SEC: $329 million comes due in January, $1.1 billion can be called in May and $453 million matures in August. In 2015, Chesapeake Energy reported $12.6 billion in revenue, which was offset by $13.5 billion in operating expenses (not including a reported impairment on oil and gas properties totaling $18.2 billion.) If 2015 is any indication, absent a robust recovery in energy prices, Chesapeake Energy would have difficulty satisfying its 2017 debt obligations. Unless, of course, it taps its credit facility.

In addition to affirming Chesapeake Energy's borrowing base, the new amendment grants the company some relief on its covenants. Its first-lien-secured-leverage ratio, net-debt-to-capitalization ratio and interest-coverage ratios have all been suspended until Sept. 30, 2017. Starting in December 2017, the company will be required to maintain a leverage ratio of 3.5x, which will be required to fall to 3.0x soon thereafter.

For now, Chesapeake Energy gets to live another day but its problems aren't far behind it.

116.     On May 4, 2016, Chesapeake reported a net loss available to common stockholders of $964 million for the first quarter of 2016, or $1.44 per fully diluted share. The primary driver of the net loss was a noncash impairment of the carrying value of

Chesapeake's oil and natural gas properties of approximately $853 million. Adjusting for the impairment and other items, the 2016 first quarter adjusted net loss available to common stockholders was $120 million, or $0.10 per fully diluted share.

117.     Discussing these results, Wells Fargo's David Tameron wrote that Chesapeake was not out of the woods yet:

> Production beat, lowered full year capex and expenses. Announced STACK asset sale for $470 million. Day to day execution continues, and recent debt exchange and subsequent asset monetizations provide some out year cushion (we see enough liquidity to cover debt maturities through at least 2018). From a Chesapeake investment perspective, we believe the company either needs a transformative M&A transaction, higher gas prices, and/or some meaningful delevering event. We remain on the sidelines.

118.     On June 9, 2016, *RealMoney* reported in an article entitled "Stressed Out: Chesapeake Energy Slips on RBC Downgrade Over Looming Debt" that:

> Chesapeake Energy (CHK) shares slid nearly 5% to $4.72 in opening trading Thursday on the heels of an RBC Capital downgrade to Underperform from Sector Perform, largely based on concerns over $2.2 billion in looming debt maturities.
>
> The analysts also noted that Chesapeake has another $1 billion in debt coming due in 2019 and again in 2020, so much-needed free cash flow could be scarce over that two-year period. Chesapeake carries more than $10 billion in total debt, and has posted a roughly $450 million net loss over the past 12 months.
>
> RBC also said that Chesapeake's management is likely to "continue to aggressively pursue transactions similar to what has occurred over the last few months" and asset sales will be of "low EBITDA contribution." (EBITDA is a standard valuation metric, especially concerning a company's ability to

generate free cash flow, and stands for earnings before interest, taxes depreciation, and amortization.)

Chesapeake closed a $385 million sale of oil and gas assets this month, tied to the Western Anadarko basin, to FourPoint Energy. But the RBC analysts suggested that Chesapeake would be better off selling more of its acreage to shore up cash, pointing to the 42,000 acres in Kingfisher, Blaine, Dewey and Canadian counties recently sold for $470 million.

"Importantly, the acreage was mostly undeveloped and does not decrease current cash flow but reduces future spending," the analysts said.

119.    On August 15, 2016, S&P downgraded Chesapeake to CC, Outlook negative, meaning that its debt was "extremely speculative."

120.    On October 13, 2016, *Dow Jones Institutional News* published an article entitled "Chesapeake Energy: The Debt's Still Just Too Darn High! -- Barron's Blog" which reported, in part:

Ahead of Chesapeake Energy's (CHK) analyst day on Oct. 20, UBS analyst William Featherston and team reaffirm their Sell rating, noting that the gas driller's "debt load remains too high." They explain:

Chesapeake will host its first Analyst Day since May 2014 in Oklahoma City next Thursday. Given investor concern over the past couple of years regarding Chesapeake's high debt load & dwindling liquidity in the face of sharply lower oil and gas prices, we expect the meeting will highlight its materially improved liquidity position as well as plans to reduce debt by another $2-3 billion by 2018. We also expect management to highlight plans to shift from its almost exclusive defensive strategy over the last two years to being more offensive by targeting annual volume growth to resume in 2018+.

Liquidity position has improved but debt load remains too high: Chesapeake has reduced its principal debt by >$1.0bn YTD through 3Q and slashed its 2017 debt maturities by two thirds to $658MM. While much of this was achieved through

debt re-financing and dilutive debt-for-equity swaps that increased shares outstanding by 34%, near and medium term liquidity concerns have been addressed. But financial leverage still remains far too high in our view and Chesapeake should lay out details on how it plans to reduce debt by $2-$3 billion over the next few years. However, even assuming Chesapeake can achieve $3bn of asset sales in 2017-18, we estimate it will still have net debt/EBITDA of >4.0x at YE18 under our price deck & before removing volumes associated with a deal.

121.    An October 20, 2016, article on *24/7 Wall Street* entitled "Why Chesapeake Energy Stock Is Tanking Thursday" reported, in part, that:

Independent oil and gas producer Chesapeake Energy Corp. (NYSE: CHK) is holding its first investor day in two years, and by the look of the share price, investors don't much like what they're hearing. The stock traded down more than 5% early Thursday morning but was down about 3% before midday.

In its presentation to investors, Chesapeake touts its efforts to get its balance sheet in order, and that story is encouraging. What is not encouraging is the company's outlook.

On slide number 144 of 177 in its presentation, Chesapeake presents a summary of its production outlook for this year and next. Production growth is estimated at flat to up 3% for 2016 and at down 5% to flat for 2017. And that comes at the cost of higher capital spending.

Liquids production is expected to reach 56 million to 60 million barrels this year and to drop to 51 million to 55 million barrels in 2017. Oil production of 33 million to 35 million barrels is forecast for both years. The decline comes in production of natural gas liquids (NGLs), forecast at 23 million to 25 million barrels this year, falling to 18 million to 20 million barrels next year. Total daily production for 2016 is expected to reach 617,000 to 637,000 barrels of oil equivalent per day, dropping to 532,000 to 562,000 barrels a day in 2017.

Operating costs are forecast to drop year-over-year in 2017, but capital spending is expected to rise from $1.4 billion to $1.5 billion this year to a range of $1.6 billion to $2.4 billion next year.

As Chesapeake's cost structure continues to improve, the company now expects to be free-cash-flow neutral in 2018. Without specifying any numbers, the company said it expects production growth of 10% to 15% year over year in 2018.

Regarding its still impressive debt of nearly $11 billion, the company has cut its debt maturities from $2.2 billion as of September 30, 2015, to $625 million at the end of September 2016. This helps with short-term cash flow obviously.

Debt reduction remains top of mind at Chesapeake. CEO Doug Lawler noted that the company plans an additional $2 billion to $3 billion in debt reduction on top of the more than $2 billion reduction it anticipates for this year. By 2019 the net debt to EBITDA ratio is expected to fall from around 6.5x to about 2x. Production growth is targeted a 5% to 15% through 2020 and Chesapeake expects to triple its margins.

The devil is in the details, and there is plenty of detail in this presentation. Technological improvements and lower costs will help make Chesapeake's plans come true, as will targeted investments in high-grade drilling locations.

The one thing the company can't control, however, is commodity price, and although that is rising now, there is no guarantee that it will continue to rise going forward.

To Chesapeake's credit, it's doing what it can and it has outlined a plausible plan. But are investors willing to wait another two years to see results? That's asking a lot.

122.    On November 3, 2016, Chesapeake reported that its third-quarter loss narrowed thanks to lower costs that helped offset a drop in revenue on reduced production and low commodities prices.  Over all, Chesapeake reported a loss of $1.16 billion, or $1.54 a share, compared with a year-earlier loss of $4.7 billion, or $7.08 a

share, a year earlier. Excluding Barnett shale exit costs, asset write-downs and other items, adjusted per-share earnings were 9 cents, compared with a year-earlier loss of 6 cents. Revenue dropped by a third to $2.28 billion.

### DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT CHESAPEAKE STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN, YET FAILED TO PROTECT THE PLAN'S PARTICIPANTS

123.    Chesapeake's tenuous financial condition as measured by, *inter alia*, its Z-Score and debt-equity ratio is objectively demonstrable:[8]

|                   | Q2'14 | Q3'14 | Q4'14 | Q1'15 | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 |
|-------------------|-------|-------|-------|-------|-------|-------|-------|-------|--------|-------|
| Z-Score           | 1.1   | 1.07  | 1.27  | 0.55  | -0.41 | -2.14 | -3.87 | -3.66 | -3.65  | -2.93 |
| Debt to Equity Ratio | 0.71  | 0.71  | 0.68  | 0.88  | 1.29  | 2.7   | 5     | 7.94  | -301.53 | -8.13 |

124.    Further, as the below graph of Chesapeake Stock's performance relative to the S&P 500 makes clear, the Company has severely underperformed the general market:



125.    Even when the comparison of Chesapeake Stock is limited to the energy sector,[9] Chesapeake lagged far behind its peers:

---

[8] The underlying data is from www.gurufocus.com.

[9]         *See*              eresearch.fidelity.com/eresearch/markets_sectors/sectors/
sectors_in_market.jhtml?tab=learn&sector=10.



126.   The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates its deterioration over the last several years. During the Class Period, although they knew or should have known that Company Stock was an imprudent investment for the Plan, their status as fiduciaries of the Plan, and the vast amount of publicly available adverse information regarding the Company's condition and prospect that rendered Chesapeake Stock imprudent for the Plan in light of the totality of circumstances prevailing during the Class Period, Defendants did nothing to protect the significant investment of the Plan Participants' retirement savings in Chesapeake Stock.

127.   Since the beginning of the Class Period through the filing of the instant complaint, the Plan's imprudent investment in Chesapeake Stock has been decimated, as indicated below by data from Google Finance:



## THE RELEVANT LAW:
## Claims for Relief under ERISA

128.   ERISA requires that every plan name one or more fiduciaries who have

"authority to control and manage the operation and administration of the plan."   29

U.S.C. § 1102(a)(1).   Additionally, under ERISA, any person or entity, other than the

named fiduciary that in fact performs fiduciary functions for the Plan is also considered a

fiduciary of the Plan.   A person or entity is considered a Plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary
> control respecting management of such plan or exercises any
> authority or control respecting management or disposition of
> its assets, (ii) he renders investment advice for a fee or other
> compensation, direct or indirect, with respect to any moneys
> or other property of such plan, or has any authority or
> responsibility to do so, or (iii) he has any discretionary
> authority or discretionary responsibility in the administration
> of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

129.   At all relevant times, Defendants are/were and acted as fiduciaries within

the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

130.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that

a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C.

§ 1109.   Plaintiffs were, and continues to be, a Plan participant pursuant to 29 U.S.C.

§ 1109.

131.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary

Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this title shall be personally
> liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan
> any profits of such fiduciary which have been made through
> use of assets of the plan by the fiduciary, and shall be subject
> to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

132.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B),

provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan

solely in the interest of the participants and beneficiaries, for the exclusive purpose of

providing benefits to participants and their beneficiaries, and with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims.

133.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to

as the duties of loyalty, exclusive purpose and prudence and are the highest known to the

law and entail, among other things:

(a)   the duty to conduct an independent and thorough investigation into, and
      continually to monitor, the merits of all the investment alternatives of a
      plan;

(b)   the duty to avoid conflicts of interest and to resolve them promptly when
      they occur.  A fiduciary must always administer a plan with an "eye single"
      to the interests of the participants and beneficiaries, regardless of the
      interests of the fiduciaries themselves or the plan sponsor;

(c)     the duty to disclose and inform, which encompasses: (1) a negative duty not

to misinform; (2) an affirmative duty to inform when the fiduciary knows

or should know that silence might be harmful; and (3) a duty to convey

complete and accurate information material to the circumstances of

participants and beneficiaries.

134.    Accordingly, if the fiduciaries of a plan know, or if an adequate

investigation would reveal, that an investment option is no longer a prudent investment

for that plan, then the fiduciaries must disregard any plan direction to maintain

investments in such stock and protect the plan by investing the plan assets in other,

suitable, prudent investments.

135.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-

fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any
> other provision of this part, a fiduciary with respect to a plan
> shall be liable for a breach of fiduciary responsibility of
> another fiduciary with respect to the same plan in the
> following circumstances: (A) if he participates knowingly in,
> or knowingly undertakes to conceal, an act or omission of
> such other fiduciary, knowing such act or omission is a
> breach; (B) if, by his failure to comply with section 404(a)(1),
> 29 U.S.C. § 1104(a)(1), in the administration of his specific
> responsibilities which give rise to his status as a fiduciary, he
> has enabled such other fiduciary to commit a breach; or (C) if
> he has knowledge of a breach by such other fiduciary, unless
> he makes reasonable efforts under the circumstances to
> remedy the breach.

136.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)

for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising

out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405 BY ALL DEFENDANTS)

137.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.   This Count alleges fiduciary breaches against all Defendants for continuing to allow the investment of the Plan's assets in Chesapeake Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because: (a) Chesapeake Stock was artificially inflated during the Class Period; and (b) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.

139.   At all relevant times, as alleged above, the Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

140.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are

prudently invested.  The Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Defendants are liable for losses incurred as a result of such investments being imprudent.

141.   Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of Chesapeake Stock.  An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Chesapeake Stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made different investment decisions.

142.   The Defendants breached their duties to prudently manage the Plan's assets.  During the Class Period, the Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take any meaningful steps to protect Plan's Participants.

143.   The Defendants further breached their duty of prudence by failing to divest the Plan of Company Stock during the Class Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

144.   The Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding Chesapeake's true financial condition and, generally, by conveying inaccurate information regarding the Company's outlook. During the Class Period, upon information and belief, Defendants fostered a positive

attitude toward Company Stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer, or as was the case here, the parent company of their employer, by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

145.   As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of Chesapeake, generalized warnings of market and diversification risks that Defendants made to the Plan Participants regarding the Plan's investment in Chesapeake Stock did not effectively inform the Plan Participants of the immediate, and future dangers of investing in Company Stock.

146.   The Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

147.   As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants lost a significant portion of their retirement investments.  Had the Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan and themselves.

148.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

149.    Additionally, the Plan was intended to comply with ERISA section 404(c) ("Section 404(c)") and the DOL's regulations issued thereunder at 29 C.F.R. 2550.404c-1 (the "404(c) Regulations"). Certain defendants retained risks of investment performance, by not complying with the 404(c) Regulations.

150.    ERISA fiduciaries and sponsors generally bear the risk of loss to plan accounts. The ERISA plan fiduciaries are generally liable for all aspects of selection and monitoring of plan investments, and are responsible for any participant claims for fiduciary breaches should something go wrong. "For a non-§ 404(c) plan, the fiduciary's selecting an investment (as provided in § 404(a)(1)(B)) is not only like a fiduciary's selecting an investment option, but also like a participant's investing in an option under § 404(c)." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 307 n.13 (5th Cir. 2007).

151.    Section 404(c) is a limited exception to this general rule. Section 404(c) provides Plan fiduciaries a "Safe Harbor" from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. *See Allison v. Bank One-Denver,* 289 F.3d 1223, 1239 (10th Cir. 2002) (Section 404(c) provides "an escape from liability for fiduciaries in certain instances where a loss results from a participant's exercise of control.").

152.     "If a plan does not qualify as a § 404(c), the fiduciaries retain liability for all investment decisions made, including decisions by the Plan participants." *Tittle v. Enron Corp.* (*In re Enron Corp. Sec. Derivative & ERISA Litig.*), 284 F. Supp. 2d 511, 578 (S.D. Tex. 2003). "Losses that do not 'result from' the participant's exercise of control are still charged against the plan fiduciary[.]" *Id.*

153.     The 404(c) Regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant."   29 C.F.R. § 2550.404c-1(c)(2)(i)-(iii).

154.     If an ERISA fiduciary "conceal[s] material nonpublic facts", then a court should look to the "facts and circumstances of the particular case" to ascertain whether the fiduciary usurped the plan participant's independent control in the transaction. § 2550.404c-1(c)(2)(ii). *Ruppert v. Principal Life Ins. Co.*, No. 4:07-cv-00344-JAJ-TJS, 2009 U.S. Dist. LEXIS 124387, at *25 (S.D. Iowa Nov. 5, 2009), *reversed on other grounds by Ruppert v. Principal Life Ins. Co.*, 796 F. Supp. 2d 959 (S.D. Iowa 2010).

155.     As shown above, Defendants concealed material non-public facts by misrepresenting the problems at Chesapeake, and thus Participants were unable to exercise independent control over their investments and holdings of the Fund.

156.     Accordingly, Section 404(c) does not apply here, and Defendants are liable for losses suffered by Participants during the Class Period. As a consequence of Defendants' concealment of material non-public information, Defendants retain liability for all investment decisions made, including decisions by the Participants. Pursuant to

ERISA §§ 404, 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1104, 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan for which Participants did not exercise independent control.

157.    Further, to the extent that, as stated in the 2016 11-K, prior to January 1, 2015, Chesapeake directed the investment of matching contributions and Employee Stock Ownership Plan (ESOP) discretionary contributions, Chesapeake maintained the risk of loss on such funds.

## COUNT II

### BREACH OF DUTY OF LOYALTY
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA
### §§ 404(a)(1)(B) AND 405 BY ALL DEFENDANTS)

158.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

159.    This Count alleges fiduciary breaches against all Defendants for continuing to allow the investment of the Plan's assets in Chesapeake Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because: (a) Chesapeake Stock was artificially inflated during the Class Period; and (b) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.

160.    At all relevant times, as alleged above, the Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

161.   ERISA  § 404(a)(1)(A),  29  U.S.C.  § 1104(a)(1)(A),  imposes  on  plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

162.   ERISA's duty of loyalty includes the duty to speak truthfully to a plan and its participants when communicating with them.  An ERISA fiduciary's duty of loyalty includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.   As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."  *Maez v. Mountain States Tel. and Tel. Inc.*, 54 F.3d 1488, 1499 (10th Cir. 1995) (citing *Varity Corp.,* 516 U.S. at 506).

163.   During the Class Period, the Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in Chesapeake Stock.

164.   During the Class Period, upon information and belief, certain Defendants, including the Chesapeake and the Benefits Committee as Plan Administrator directly and indirectly communicated with the Plan's Participants and omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, conference calls with analysts, SEC

filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions). Defendants acted as fiduciaries to the extent of this communication activity.

165. Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press concerning employees' natural bias toward investing in company stock, including that:

(a) Out of loyalty, employees tend to invest in company stock;

(b) Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c) Employees tend not to change their investment option allocations in the plan once made; and

(d) Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

166. Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plan's Participants. Defendants, however, disregarded their duties of loyalty to the benefit of the Company as demonstrated by the Plan's massive investment of Plan assets in Company Stock.

167. In part, because at least some of the Defendants' compensation was tied to Chesapeake Stock a substantial portion of some of Defendants' wealth was tied up in ownership of Chesapeake Stock, these Defendants had a conflict of interest which put

them in the position of having to choose between their own interests and the interests of the Plan's Participants, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); 29 U.S.C. § 1104(a)(1)(B).  These Defendants, while attempting to shore up Chesapeake during the Class Period as its stock price inevitably plummeted, breached their duties to the Plan and its Participants, and failed to consider at any time during the Class Period what was in the best interest of the Plan and its Participants as they should have done as Plan fiduciaries.

168.   The Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

169.   As a consequence of the Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plan and its participants, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiffs and the Plan's other participants, lost a significant portion of their retirement investments.

71

170.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY AND DIRECTOR DEFENDANTS )

171.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

172.   This Count alleges fiduciary breaches against the Company and any John Doe Defendants who acted on behalf of the Company in appointing and monitoring the members of the Benefits Committee and Investment Committee (the "Monitoring Defendants").

173.   At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

174.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

175.   Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

176.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

177.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

178.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)      failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as

73

the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b)     failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

(c)     to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

(d)     failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

179.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

180.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the

monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

181.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

182.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

183.    The Chesapeake Stock price collapse as of the filing of the instant complaint, which devastated the Plan's assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA-mandated fiduciary duties.

184.    Defendants – who knew or should have known that Chesapeake Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire further Chesapeake Stock, while taking no action to protect their wards as Chesapeake's condition worsened and the Plan Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its participants.

185.   To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, the following alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

186.   First, Defendants could have and should have directed that all Company and Participant contributions to the Fund be held in cash rather than be used to purchase Chesapeake Stock.  The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of Chesapeake Stock.

187.   Second, Defendants should have closed the Company Stock itself to further contributions and directed that contributions be diverted from Company Stock into prudent investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

188.   Additionally, because Defendants could and should have concluded that Chesapeake Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plan's holdings.

189.    As discussed above, Defendants had numerous options to protect the Plan and its Participants but failed to do so.

190.    As a result of Defendants' breaches, the Plan suffered tens of millions of dollars in losses during the Class Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

191.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

192.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

193.    As noted above, with respect to calculation of the losses to a plan the Plan and its Participants have suffered tens of millions of dollars in damages as a result of Defendants' breaches of fiduciary duty.

194.    Plaintiffs, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an

amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

195.   Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.   A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan's participants during the Class Period;

B.   A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's asset and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.   A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      A Judgment awarding actual damages against Defendants jointly and severally in the amount of any losses the Plan suffered, to be allocated among the Plan participants' individual accounts in proportion to the accounts' losses;

E.      A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Plan participants who had any portion of their account balances invested in Chesapeake Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Chesapeake Stock ;

F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

## JURY DEMAND

Plaintiffs demand a jury trial.

Dated: March  14, 2017

NORMAN & EDEM, P.L.L.C.

  /s/    L. Mark Bonner
Emmanuel E. Edem, OBA #2614
L. Mark Bonner, OBA #14541
127 N.W. 10th St.
Oklahoma City, OK 73103
405-272-0200
405-272-1055 (fax)
lmb@nemw.com

and

**STULL, STULL & BRODY**
Michael J. Klein  (*Pro Hac Vice* motion forthcoming)
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email: mklein@ssbny.com